IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * * * | 4:09-CR-00058 |
| Plaintiff, | * | |
| v. | * * | |
| CHAD EDWARD NICHOLSON, | * * | ORDER GRANTING |
| Defendant. | * * | COMPASSIONATE RELEASE |

Before the Court is Defendant Chad Edward Nicholson's pro se Motion for Compassionate Release filed on April 22, 2020. ECF No. 125. The Government filed its resistance on April 29. ECF No. 130. Per the Southern District of Iowa's Administrative Order (AO) No. 20-AO-9-P and the Criminal Justice Act, the Court appointed counsel, who filed a supplemental brief in support of release on May 6. ECF Nos. 131–32. The Government responded to this supplemental brief, as the AO permits, on June 2. ECF No. 136. The matter is fully submitted.

## I. BACKGROUND

At sentencing, the Court recognized "the obvious[:] that [Defendant has] had a very difficult life." ECF No. 133 at 16:11–12. That was an understatement.

Defendant remembers open methamphetamine use in his home as early as age fourteen. ECF No. 85 ¶ 81. He described his childhood home as a dysfunctional "dope house." *Id.* ¶ 83. The family stole access to electricity. *Id.* At one point, a neighborhood dispute resulted in gunfire into the home, injuring his mother. *Id.*

By age fifteen, Defendant used and sold methamphetamine—like the rest of his family. *Id.* ¶¶ 83, 94. "I don't know too many boys that don't look up to their dad," Defendant said at sentencing. ECF No. 133 at 10:12–15.

As Defendant began high school, police raided his home to shut down his older brothers' methamphetamine laboratory. *Id.* ¶ 84. It was the third such raid of the residence. *Id.*

Defendant did well in school. *See id.* ¶¶ 84, 100. Indeed, at sentencing, the Court recognized Defendant's "intelligen[ce]." ECF No. 133 at 16:19. Regardless, he was expelled from high school by age sixteen and committed to the Iowa State Training School for Boys, where he obtained his GED. ECF No. 85 ¶¶ 51, 84, 104. Following his release, he returned to using and selling drugs. *Id.* ¶ 84. He spent 1999–2002 and 2003–2006 in state prison. *Id.* ¶¶ 105, 107. Defendant's father died in 2004 from a methamphetamine-induced heart attack. *Id.* ¶ 81.

Defendant's life then improved dramatically. First, he fathered three children with his current wife, Shawn. *Id.* ¶ 85. They married in 2008 and appear to have a healthy relationship. *Id.* The presentence investigation report and letters to the Court also indicate Defendant fostered strong bonds with his children.[1] *See id.*; ECF No. 132 at 8, 24–30.

Defendant also obtained stable, legitimate work as a pressman at a printing company. ECF No. 85 ¶ 104. He averaged sixty hours of work a week to provide for his young family. ECF No. 133 at 12:1. But in 2008, his plant cut hours amid the recession. *Id.* at 12:11–13. He lost access to overtime, and his regular hours were insufficient. *Id.* at 12:23–25.

Debts piled up, *id.* at 13:1–4, and after three months of falling farther behind Defendant "decided to do something that [he] told [him]self [he] was never going to do again." *Id.* at

---

[1] Defendant also appears to have a child from a previous marriage nearly ten years prior. ECF No. 85 ¶ 86.

13:14–15, *see also* ECF No. 132 at 13.  He again started selling and using methamphetamine.  *See* ECF No. 133 at 13:14–24; ECF No. 85 ¶ 84.  He was suspended from his job because of drug use in October 2008 and resigned in November.  ECF No. 85 ¶ 104.

That leads to the current case.  Defendant helped his older brother Scottie Lee Nicholson sell a large amount of methamphetamine.  *Id.* ¶ 16.  Scottie claimed to be the ringleader of the operation, and Defendant worked as one of his distributors.[2]  ECF No. 132 at 35; ECF No. 85 ¶¶ 13–17, 31, 35; *see also* ECF No. 133 at 5:3–6.

Both pleaded guilty to participating in a drug distribution conspiracy in 2010.  ECF Nos. 70, 90.  Both faced the possibility of life in prison, and both agreed to a twenty-year statutory minimum sentence under 21 U.S.C. § 841(b)(1)(A) in their plea agreements.  *Compare* ECF No. 104 ¶ 6, *with* ECF No. 85 ¶ 5.

But Scottie nevertheless received a sentence of 120 months imprisonment and five years of supervised release.[3]  ECF No. 107.  The Court then reduced his imprisonment to just seventy months following retroactive changes to the U.S. Sentencing Guidelines.  ECF No. 117.  He was released in 2015, and the Court terminated his supervised release in 2018 because of his sustained efforts toward self-improvement.  ECF No. 124 at 1, 3.

Defendant did not catch the same break.  Unlike his brother, Defendant received the twenty-year minimum and ten years of supervised release.[4]  ECF No. 133 at 17:18–18:8.  As the Court told Defendant at sentencing: "I don't disagree with your observation that the sentence is

---

[2] Under the 2009 Sentencing Guidelines, Scottie was responsible for 4390.8 kilograms of marijuana equivalent while Chad was responsible for 4106.56 kilograms of marijuana equivalent.  *See* ECF No 85 ¶ 35.  Even so, the Court did not give Defendant a role reduction under the Guidelines, which would not have affected his sentence.  *See id.*; ECF No. 133 at 6:25–7:3.

[3] In his letter to the Court, Scottie credited this to his "substantial assistance."  ECF No. 132 at 35.

[4] According to Defendant and Scottie, Defendant sought to cooperate with the Government.  ECF No. 132 at 35; ECF No. 133 at 14:20–25.  Apparently, Defendant, who was arrested several weeks after Scottie, did not provide sufficiently useful information.  *See* ECF No. 133 at 14:22–23.

too long.  This is not a decision that my branch of government is in charge of."  *Id.* at 17:2–4.

And in part because Defendant faced a mandatory minimum, the Court denied Defendant's 2015

motion to reduce his sentence based on the Guidelines changes that benefited Scottie.  *See* ECF

No. 114.

Defendant has been in custody since March 26, 2009.  ECF No. 85 ¶ 111.  During these

eleven years, he has maintained a strong relationship with his wife and children.  *See* ECF

No. 132 at 8; 24–30.  He sends his family money when he can, calls often, and makes his

children gifts with his newly acquired crocheting skills.  *Id.* at 24–30, 34.  Meanwhile, his family

teeters on the edge of homelessness.  *Id.* at 19.  His teenage daughter started living with a friend

because Defendant's wife "couldn't afford to take care of her."  *Id.* at 18; *see also id.* at 24–25.

In prison, Defendant participates in Alcoholics Anonymous, a Bible "Jeopardy" game,

and prayer group.  *Id.* at 34.  He has taken classes in parenting and various heavy-industry skills.

*Id.*  He has held several jobs.  *Id.*  Although his older brother Scottie wrote to the Court that he

remains grateful for his own early release, he also wrote Defendant "has done much better than I

[did] while incarcerated" and has "proven to be a better candidate over myself" for early release.

*Id.* at 35.

Meanwhile, the virus known as COVID-19 has killed more than 106,000 Americans and

infected more than 1.8 million in a few months.  *Mortality Analysis*, Johns Hopkins U. & Med.

(June 3, 2020, 8:15 AM), https://coronavirus.jhu.edu/data/mortality.  "At this time, there is no

known cure, no effective treatment, and no vaccine.  Because people may be infected but

asymptomatic, they may unwittingly infect others."  *S. Bay United Pentecostal Church v.*

*Newsom*, No. 19A1044, 2020 WL 2813056, at *1 (U.S. May 29, 2020) (Roberts, C.J.,

concurring).

We have limited access to courts, schools, churches, theaters, and "non-essential" businesses—places where there are too many people and too little space to keep the virus from spreading.  That also sounds a lot like federal prison.  Already "tinderboxes for infectious disease," prisons now are even more dangerous than we typically accept.  *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020).

At least 1904 prisoners and 175 BOP staff have "open" and "confirmed" cases of the virus.  *COVID-19 Cases*, Fed. Bureau Prisons (June 3, 2020), https://www.bop.gov/coronavirus/. Seventy-one inmates have died.  *Id.*  But it is hard to compare these numbers to those for the nation at large.  First, the BOP case count fluctuates both up and down because it only includes "open" cases.  *See COVID-19 Cases*, Fed. Bureau Prisons (May 21, 2020), https://www.bop.gov/coronavirus/ (noting BOP "positive test numbers are based on the most recently available *confirmed lab results* involving *open cases*"); Christian Boone, *Employee's Death Raises Questions About Conditions Inside Federal Pen*, Atlanta J. Const. (May 4, 2020), https://www.ajc.com/news/local/employee-death-raises-questions-about-conditions-inside-federal-pen/3Enh61w6Di8rcT9YuY5PPK/ (quoting BOP spokesperson as saying "[t]he total number of open, positive test, COVID-19 cases fluctuates up and down").  And second, it remains unclear how likely BOP is to test an inmate at all.  *See BOP Expands COVID-19 Testing: Rapid Testing Available at Select Facilities*, Fed. Bureau Prisons (April 24, 2020, 1:00 PM), https://www.bop.gov/resources/news/20200424_expanded_testing.jsp (describing testing of asymptomatic patients at "select facilities").

Under this case-counting framework, there does not appear to be any "open" and "confirmed" cases at Defendant's prison in Thomson, Illinois.  At the same time, the BOP transferred inmates from a facility with confirmed cases to Thomson.  *Inmates Transferred to*

5

*USP Thomson from Chicago Prison with COVID-19 Outbreak*, KWQC (April 25, 2020, 2:29

PM), https://www.kwqc.com/content/news/Inmates-transferred-to-USP-Thomson-from-Chicago-

prison-with-COVID-19-outbreak-569951891.html; *see also* Press Release, Senator Dick Durbin

et al., Durbin, Duckworth, Bustos Statement on BOP Transfer of Inmates to Thomson Prison

(April 24, 2020), https://www.durbin.senate.gov/newsroom/press-releases/durbin-duckworth-

bustos-statement-on-bop-transfer-of-inmates-to-thomson-prison.

The BOP indeed faces a daunting task.  It has undertaken emergency measures to halt the

virus's spread.  *BOP Implementing Modified Operations*, Fed. Bureau Prisons,

https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 3, 2020).  Social visits are

cancelled, prisoner movement is limited, and legal visits are suspended subject to exception.  *Id.*

The BOP has moved additional inmates to home confinement.  ECF No. 136-1 at 2–3.  At the

same turn, it is unclear what the future holds as states relax restrictions on free residents,

including BOP employees.

Defendant sought compassionate release from his Warden on April 16, 2020.  ECF No.

132 at 11.  The Warden responded: "We recognize that you, like all of us, have legitimate

concerns. . . .  Those who meet the criteria[] are being placed into quarantine pending final

approval."  *Id.*  Defendant remains in custody with a release date of May 1, 2026.

## II.  ANALYSIS

The First Step Act of 2018 amended numerous provisions of the U.S. Code to promote

rehabilitation of prisoners and unwind decades of mass incarceration.  *See* Pub. L. No. 115-391,

132 Stat. 5194; Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1

(2019).  Congress designed the provision at issue here, 18 U.S.C. § 3582(c)(1)(A), for

"Increasing the Use and Transparency of Compassionate Release."  § 603(b), 132 Stat. at 5239.

Section 3582(c)(1)(A) allows defendants, for the first time, to petition district courts directly for compassionate release.  *Id.*  Under the old regime, defendants could petition only the BOP Director, who could then make a motion, at his or her discretion, to the district court.  *See* U.S. Sentencing Guidelines Manual § 1B1.13 cmt. n.4 (U.S. Sentencing Comm'n 2018) [hereinafter U.S.S.G.].  The Director rarely did so.  *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).

## A.  *Exhaustion*

The First Step Act's gate-keeping provision created two ways for a defendant to bring a compassionate release motion to a district court.  The defendant may file a motion once he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*."[5]  § 3582(c)(1)(A) (emphasis added).  With this second path, the statute's plain text states only that thirty days must past after the defendant requests compassionate release from the warden.  No more.  *United States v. York*, No. 3:11-CR-76, 2019 WL 3241166, at *5 (E.D. Tenn. July 18, 2019).  Thus, while § 3582(c)(1)(a)'s gate-keeping provision often is described as an "exhaustion" requirement, it is not "an exhaustion requirement in the traditional sense . . . as it allows a defendant to come to court before the agency has

---

[5] "Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise. . . ." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979).  And as in *Reiter*, "here it does not." *Id.*; *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2130 (2016) (Thomas, J., dissenting).  This is so because the phrase "*whichever* is earlier" makes clear that full exhaustion and "the lapse of 30 days" constitute two distinct paths to federal court. § 3582(c)(1)(A) (emphasis added).

rendered a final decision." *United States v. Haney*, No. 19-CR-541 (JSR), 2020 WL 1821988, at

*3 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.).

Here, Defendant has satisfied the statute's gate-keeping provision because thirty days

have passed since Defendant filed a petition for compassionate release with his warden. *See*

ECF No. 132 at 11. Defendant remains incarcerated, and there is no indication the BOP took any

further action on his request. Thus, as of May 16, Defendant satisfied the gatekeeping

requirement. The Court may thus address the merits.[6] *See* § 3582(c)(1)(a).

B. *Extraordinary and Compelling Reasons*

Compassionate release provides a path for defendants with "extraordinary and

compelling reasons" to leave prison early. § 3582(c)(1)(A)(i). Such a sentence reduction must

comply with the 18 U.S.C. § 3553(a) factors and "applicable policy statements issued by the

Sentencing Commission." § 3582(c)(1)(A).

1. Definitions

Congress never defined what constitutes "extraordinary and compelling." *See* 28 U.S.C.

§ 994(t). Instead, the statute directed the Commission to promulgate "the criteria to be applied

and a list of specific" extraordinary and compelling examples. *Id.* Before the First Step Act, the

Commission provided just three.[7]

The Commission also provided a catch-all provision that allows the BOP Director to

determine "there exists in the defendant's case an extraordinary and compelling reason other

---

[6] The Government's response, filed April 29, noted thirty days had not yet passed since
Defendant filed his request with the warden. ECF No. 130. That no longer was the case as of May 16.

[7] First, the defendant's medical condition is such that he suffers from a "terminal illness" or the
condition "substantially diminishes the ability of the defendant to provide self-care within the
environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G.
§ 1B1.13 cmt. n.1.

than, or in combination with" the Commission's three examples.  U.S.S.G. § 1B1.13 cmt. n.1(D).

That still begs the question: what is extraordinary and compelling?

Congress and the Commission gave two guideposts.  Extraordinary and compelling

reasons "need not have been unforeseen at the time of sentencing."  *Id.* § 1B1.13 cmt. n.2.  For

example, just because a judge believes a defendant will dramatically improve himself while

incarcerated, that does not mean she cannot deem such improvement extraordinary and

compelling.  And although "rehabilitation . . . is not, *by itself*, an extraordinary and compelling

reason," its mention by the Commission and Congress indicate rehabilitation may be considered

with other factors.  *See id.* § 1B1.13 cmt. n.3 (emphasis added); § 994(t) ("Rehabilitation of the

defendant alone shall not be considered an extraordinary and compelling reason.").

Courts otherwise are left to themselves because the Commission, for whatever reason,

never updated its policy statement, as statutorily required, for the First Step Act.[8]  Rather, the

outdated policy statement still assumes compassionate release "may be granted *only* upon motion

by the Director of the Bureau of Prisons."  U.S.S.G. § 1B1.13 cmt. n.4 (emphasis added).  That is

no longer the law.  This left district courts in a conundrum.  On the one hand, Congress

unequivocally said it wishes to "[i]ncreas[e] the [u]se . . . of [c]ompassionate [r]elease" by

allowing district courts to grant petitions "consistent with *applicable* policy statements" from the

---

Second, "[t]he defendant (i) is at least [sixty-five] years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least [ten] years or [seventy-five] percent of his or her term of imprisonment, whichever is less."  *Id.*

Third, the defendant's family circumstances include either "(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children" or "(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner."  *Id.*

[8] The Commission cannot amend its guidelines until it again has four voting commissioners. *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *1 n.1 (S.D. Tex. June 17, 2019) (quoting *United States v. Handerhan*, No. 1:10-CR-00298, 2019 WL 1437903, at *1 n.4 (M.D. Pa. Apr. 1, 2019)).  The Commission still has only two voting members. *About the Commissioners*, U.S. Sentencing Comm'n, https://www.ussc.gov/commissioners (last visited June 2, 2020).

Commission.  § 3582(c)(1)(A) (emphasis added).  On the other hand, the Commission—unable

to take any official action—has not made the policy statement for the old regime applicable to

the new one.

Many courts, including this one, have concluded this means the Commission lacks an

applicable policy statement regarding when a court can grant compassionate release.  *United

States v. Stephenson*, No. 3:05-CR-00511, 2020 WL 2566760, at *4 (S.D. Iowa May 21, 2020);

*United States v. Haynes*, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *14 (E.D.N.Y. Apr. 22,

2020) (citing thirteen such cases).  In the absence of an applicable policy statement, these courts

conclude "the Court can determine whether any extraordinary and compelling reasons other than

those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant granting relief."  *Cantu*, 2019

WL 2498923, at *5; *see also United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at

*3 (D. Me. July 11, 2019) (treating "the previous BOP discretion to identify other extraordinary

and compelling reasons as assigned now to the courts").  The result is that the district court can

consider anything—or at least anything the BOP could have considered—when assessing a

defendant's motion.

The number of courts adopting this position has grown more still as society grapples with

COVID-19's profound penological consequences.  *E.g.*, *Rodriguez*, 2020 WL 1627331, at *12.

Indeed, the Court's reading "appears to be the majority position."  *United States v. Scott*, No. 17-

CR-156, 2020 WL 2508894, at *8 (E.D. Wis. May 15, 2020).  It also is safe to say Congress is

aware of courts' use of the law during the pandemic.  *See* Cong. Research Serv., R46297,

*Federal Prisoners and COVID-19: Background and Authorities to Grant Release* 9 (2020).

To be sure, some courts and the Government still maintain that the First Step Act merely

allows courts to grant a motion for compassionate release if the BOP Director would have done

the same under the Sentencing Guidelines *and* the BOP Program Statement written for the old law. These courts conclude judges may not stray beyond the specific instances listed in § 1B1.13 cmt. n.1 (A)–(C). *E.g.*, *United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3805349, at \*4 (S.D. Ala. Aug. 13, 2019). They reason that the Sentencing Commission reserved § 1B1.13 cmt. n.1's residual provision for the BOP Director and only the BOP director. *Id.*

The Court remains unpersuaded. Courts assume Congress legislates with the full knowledge of how agencies have interpreted earlier versions of a statute. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000) (noting Congress has "effectively ratified the FDA's long-held position"). Congress also can "revoke or amend" the Sentencing Commission's guidelines and policy statements at any time. *United States v. Anderson*, 686 F.3d 585, 590 (8th Cir. 2012) (citing *Mistretta v. United States*, 488 U.S. 361, 393–94 (1989)). The U.S. Supreme Court repeatedly has noted that "'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947)). Although titles are not dispositive, sometimes they can be "especially valuable." *Yates v. United States*, 574 U.S. 528, 552 (2015) (Alito, J., concurring).

Here, Congress knew of the BOP's rare granting of compassionate release petitions.[9] Until 2013, on average, "only [twenty-four] inmates were released each year." *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice). That number

---

[9] The First Step Act's compassionate release provisions originally appeared as a stand-alone bill. Granting Release and Compassion Effectively Act of 2018, S. 2471, 115th Cong. (2018). That bill explicitly sought to "improve the compassionate release process of the Bureau of Prisons." *Id.*

increased to eighty-three inmates between August 2013 and September 2014 following complaints to the BOP from the Inspector General's office. *Id.* Since Congress still amended the program following this increase, one can infer Congress thought eighty-three was still insufficient. Because rather than "effectively ratif[ying]" the BOP's position, Congress sought to overturn it by statute. *Brown & Williamson Tobacco Corp.*, 529 U.S. at 144.

The Act listed these changes under the title of "Increasing the Use and Transparency of Compassionate Release." § 603(b), 132 Stat. at 5239. That title is "especially valuable" here. *Yates*, 574 U.S. at 552 (Alito, J., concurring). The Court assumes the BOP Director faithfully executes the narrowly drawn policy and program statements related to compassionate release. Therefore, the only way direct motions to district courts would increase the use of compassionate release is to allow district judges to consider the vast variety of reasons that may be "extraordinary and compelling."

The Court acknowledges the policy arguments to the contrary. Yes, releasing defendants from incarceration is a delicate business—but not any more so than incarcerating them initially. Indeed, Congress and the Supreme Court have long trusted district courts to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

The Court's reading also does not—and has not—allowed judges to release any prisoner. The Court recognizes and respects the intricate sentence-adjustment scheme Congress has created. The Court also knows it must still act in harmony with any sentencing policy guidelines that remain applicable and the § 3553(a) factors. § 3582(c)(1)(A). For instance, the need to appropriately punish severe conduct and not introduce sentencing disparities between defendants

convicted of similar crimes provide additional limits on a judge's ability to release people from custody. *See* § 3553(a)(2)–(6).

Therefore, if the First Step Act is to increase the use of compassionate release, the most natural reading of § 3582(c) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it. Unqualified "deference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role." *Fox*, 2019 WL 3046086, at *3.

2. Defendant's Extraordinary and Compelling Reasons

At sentencing, the Court acknowledged Congress had tied its hands with respect to Defendant's sentence. ECF No. 133 at 17:2–4. The question now is whether Congress untied them with § 3582(c)(1)(A).

a. COVID-19

The number of courts agreeing the COVID-19 pandemic constitutes an extraordinary and compelling reason for release if there ever was one grows by the day. *E.g.*, *United States v. Moore*, No. 3:16-CR-00171-JO, 2020 WL 2572529 (D. Ore. May 21, 2020); *United States v. Galloway*, No. RDB-10-0775, 2020 WL 2571172 (E.D. Mich. May 21, 2020); *United States v. Parker*, No. 2:98-cr-00749, 2020 WL 2572525 (C.D. Cal. May 21, 2020*)*; *United States v. Schneider*, No. 14-CR-30036, 2020 WL 2556354, at *1 (C.D. Ill. May 20, 2020); *United States v. Hill*, No. 3:19-cr-00038 (JAM), 2020 WL 2542725 (D. Conn. May 19, 2020); *United States v. Bright*, No. 2:15CR00015-005, 2020 WL 2537508 (W.D. Va. May 19, 2020); *United States v. Bischoff*, No. 17-cr-196-JD, 2020 WL 2561423 (D.N.H. May 18, 2020); *United States v. Cotinola*, No. 13-CR-03890-MV, 2020 WL 2526717, at *3 (D.N.M. May 18, 2020); *United States v. Rountree*, No. 1:12-CR-0308 (LEK), 2020 WL 2610923 (N.D.N.Y. May 18, 2020);

*United States v. Johnson*, No. 15-cr-125 (KBJ), 2020 WL 2515856 (D.D.C. May 16, 2020);

*United States v. Bess*, No. 16-CR-156, 2020 WL 1940809, at *9 (W.D.N.Y. Apr. 22, 2020);

*United States v. Smith*, No. 12 CR. 133 (JFK), 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13,

2020); *United States v. Hernandez*, No. 18 CR. 834-04 (PAE), 2020 WL 1684062, at *3

(S.D.N.Y. Apr. 2, 2020); *Rodriguez*, 2020 WL 1627331, at *1; *United States v. Jepsen*, No. 3:19-

CV-00073(VLB), 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020); *United States v. Campagna*,

No. 16 CR. 78-01 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020).

    The Government notes there indeed are far fewer infections among federal prisoners than

Americans at large.  ECF No. 136 at 6–7.  There also are far fewer Americans inside federal

prisons than outside of them.  Accounting for that discrepancy, the former category is much

more likely to have had a confirmed case of the virus.[10]  And although USP Thomson does not

have a confirmed, open case, even the prison's Warden recognized Defendant has "legitimate

concerns."  ECF No. 132 at 11.  The Court also remains troubled by the prison's recent handling

of transferees.  Durbin et al., *supra*.  As other courts have noted, the fact a prison has no

confirmed open cases today does not provide much assurance in the current environment.  *See*

*Moore*, 2020 WL 2572529, at *2 ("Some BOP facilities have seen [outbreaks] grow into

hundreds of confirmed cases in a matter of weeks.").  Thus, the risks of COVID-19 cut in favor

of extraordinary and compelling reasons supporting compassionate release.[11]

---

    [10] There are at least 1904 "open" cases, 3631 recovered cases, and 71 deaths among 148,050
federal prisoners in BOP and community facilities, representing **3.79%** of the BOP population.  *COVID-19 Cases*, Fed. Bureau Prisons (June 3, 2020), https://www.bop.gov/coronavirus/.  There have been at
least 1,831,821 confirmed cases among roughly 329,731,335 Americans, representing **0.56%** of the
population.  *Compare Mortality Analysis*, Johns Hopkins U. & Med. (June 3, 2020, 8:15 AM),
https://coronavirus.jhu.edu/data/mortality, *with U.S. and World Population Clock*, U.S. Census Bureau,
https://www.census.gov/popclock/ (last visited June 3, 2020).
    [11] Despite the Government's characterization, *see* ECF No. 136 at 11, the Court does not hold that
every federal inmate should now receive compassionate release because of the COVID-19 pandemic.
*See, e.g.*, *United States v. Wilkinson*, No. 1:14-cr-00055, ECF No. 39 (S.D. Iowa May 22, 2020).  Rather,

b.  Rehabilitation

As discussed above, and as the Government argues, "[r]ehabilitation of the defendant *alone* shall not be considered" sufficiently extraordinary and compelling to justify compassionate release.  § 994(t) (emphasis added); *see also* ECF No. 136 at 9.  For the word "alone" to do any work—as it must—that means courts can consider rehabilitation as *part* of a compassionate release motion.  *Cf. Corley v. United States*, 556 U.S. 303, 314 (2009) (stating that a "statute should be construed so that effect is given to all its provisions" (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004))).  Several courts, including this one, have concluded the same and considered a defendant's rehabilitation in granting compassionate release.  *E.g.*, *Stephenson*, 2020 WL 2566760, at *6; *United States v. Wade*, No. 2:99-CR-00257-CAS-3, 2020 WL 1864906, at *5 (C.D. Cal. Apr. 13, 2020); *United States v. Chan*, No. 96-CR-00094-JSW-13, 2020 WL 1527895, at *6 (N.D. Cal. Mar. 31, 2020); *United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *3 (D. Kan. Mar. 11, 2020).

Here, Defendant has provided ample evidence that he is no longer the same person who this Court incarcerated more than a decade ago.  After every disadvantage he has faced and every bad choice he has made, Defendant has used his eleven years in prison to obtain job skills, attend substance abuse meetings, develop a moral compass, take parenting classes, and knit gifts for his children.  ECF No. 132 at 24–30, 34.  He calls often and *sends money home* when he can.  *Id.* at 34.  It is worth noting that the flow of funds normally is reversed.  Even the Government acknowledges "[h]is care for his family is commendable," if insufficient for release.  ECF No. 136 at 8.  As his older brother Scottie—his rehabilitated and released coconspirator—put it,

---

COVID-19 is but one reason that can cut in favor of compassionate release.  Even when it does, the § 3553(a) factors still must support release, which is no given.  *E.g.*, *United States v. Starr*, No. 4:06-CR-00080, 2020 WL 2312045, at *1 (S.D. Iowa May 8, 2020).

Defendant "has done much better than I [did] while incarcerated" and has "proven to be a better candidate over myself" for early release. *Id.* at 35.

The Court realizes Defendant appeared to be on the path to rehabilitation before his latest relapse. And indeed, as in 2008, Defendant would face a weakened economy that no doubt will make lawful work harder to find. However, Defendant has a standing offer of employment, ECF No. 132 at 37, and his older brother, who facilitated Defendant's most recent crimes, has reformed, ECF No. 124. Thus, the Court finds Defendant's rehabilitation following a life of challenges and errors cuts in favor of release, even if it is insufficient to justify release on its own under § 994(t).

    c.   Family Circumstances

Defendant, relatedly, argues that he needs to be released to aid his financially struggling family. ECF No. 132 at 8–9. The Sentencing Commission's policy statement provides that family circumstances may warrant compassionate release following "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children." U.S.S.G. § 1B1.13 cmt. n.1(C)(i). As discussed above, that policy statement is inapplicable to Defendant's Motion because it was promulgated before the First Step Act. The Court nevertheless takes it under advisement.

The Government argues Defendant does not claim is wife is dead or "incapacitated." ECF No. 136 at 7. But Defendant certainly does more than "allege[] only general concerns about his family's wellbeing and economic standing." *Id.* Letters from Defendant's wife and children present a tragic—and compelling—image of a family balancing on the edge of poverty. Defendant's wife is absent at home because of long hours and has struggled to find a large enough apartment she can afford. ECF No. 132 at 19 ("There's always something to worry

about, and there's always something to dread.  Currently me, my three children that live with me, and my grandson are facing homelessness.").  Defendant's wife specifies the children "that live with [her]," *id.*, because the couple's teenage daughter, Aliana, moved in with a friend, *id.* at 25.  Defendant's wife "couldn't afford to take care of her."  *Id.* at 18.

In a truly remarkable letter to the Court, Aliana—a minor—states she is, in effect, parentless.  *Id.* at 25.

> Some could argue that that's not a reasonable argument because we always had our mother, but that's simply not true.  Although she lived with us and did her best, she could never be around much.  She worked vigorous hours to make enough money to support four children on her own, but [it's] always been only enough to merely get by.  And in order to make enough money to scrape by, she had to give up all of the time she had to spend with us.

*Id.* at 24.

The Court realizes another family kindly gave Defendant's daughter a place to live.  But how is this not the "incapacitation of the caregiver of the defendant's minor child"?  U.S.S.G. § 1B1.13 cmt. n.1(C)(i).  And if these circumstances are not extraordinary, that is only because they are too common.  The Court finds Defendant's family circumstances cut in favor of release.

d.  Sentencing Disparity

Several courts, including this one, have held they can consider sentencing disparities created by changes in law as part of a compassionate release motion.  *Stephenson*, 2020 WL 2566760, at *7; *United States v. McPherson*, No. CR94-5708RJB, 2020 WL 1862596, at *5 (W.D. Wash. Apr. 14, 2020) ("It is extraordinary that a civilized society can allow this to happen to someone who, by all accounts, has long since learned his lesson."); *Wade*, 2020 WL 1864906, at *4; *United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *5 (D. Utah Feb. 18, 2020) (considering non-retroactive changes to 18 U.S.C. § 924(c)).  In some cases, the government appears to have accepted these decisions.  *United States v. Urkevich*, No. 8:03CR37,

2019 WL 6037391, at *4 (D. Neb. Nov. 14, 2019) ("A reduction in his sentence is warranted by extraordinary and compelling reasons, specifically the injustice of facing a term of incarceration forty years longer than Congress now deems warranted for the crimes committed."), *appeal dismissed following government request*, No. 20-1603 (8th Cir. April 1, 2020).

Here, Defendant would be nearing release if the law was then what it is now.  Back then, Defendant faced a twenty-year mandatory minimum under § 841(b)(1)(A) because he committed his offense with a prior drug conviction.  ECF No. 85 ¶¶ 114.  However, Congress has since reduced the mandatory minimum for violating the same statute with a prior drug conviction to fifteen years.  *See* § 841(b)(1)(A).  Defendant has been in custody for just eleven years.  Even with good time credits, which Defendant has earned, and early transition into a reentry center, Defendant likely would still be in prison if sentenced under modern law, if nearing his release date.

But this case presents particularly unique—as well as extraordinary and compelling— facts where two codefendants with similar records facing similar statutory minimums came away with dramatically different sentences.  The Court recognizes prosecutors generally decide who should receive such a massive break.  The carrot of a lower sentence is a useful tool in solving crimes—even if it rewards those who only know more because they are more culpable. Nevertheless, the rehabilitative records of both Defendants show the manifest unfairness, on these facts, of such a disparity.  The COVID-19 pandemic, which creates additional risks of keeping any person in prison, only underscores this extraordinary and compelling unfairness. Congress passed a statutory minimum for time in federal prison, not a statutory minimum for time in federal prison during a lethal pandemic that the BOP has tried—but so far failed—to contain.

The Court is sensitive that retroactivity for sentencing calculations generally is the Legislature's province.  But Congress demonstrated how some facts that are insufficient for release alone can still be considered as part of the extraordinary-and-compelling analysis.  *See* § 994(t).  Thus, the Court can still consider the resulting sentencing disparity as part of a motion for compassionate release.  And if this is so, it is hard to argue that the unfairness of keeping a man in prison for years more than if he had committed the same crime today is neither extraordinary nor compelling.  This, along with this case's rather unique sentencing disparity, cuts in favor of release, too.

Defendant does not squarely fit in one of the three categories that once formed the heartland of compassionate release cases.  He is not terminally ill.  He is not older than sixty-five.  His wife can afford to house and feed *most* of their minor children.  *See* § 1B1.13 cmt. n.1(A)–(C).  But Congress recognized these three categories created by the Sentencing Commission were insufficient when it sought to open compassionate release to more inmates. And regardless, even the Commission realized there would be "extraordinary and compelling" cases that fell outside the heartland.  The risks of COVID-19 at USP Thomson, Defendant's rehabilitation, family circumstances, and his greater-than-necessary sentence constitute extraordinary and compelling reasons.

## C.  *§ 3553(a) Factors*

The Court must also consider if compassionate release comports with any applicable § 3553(a) factors.  § 3582(c)(1)(A).  The Court's lodestar in such analyses is to ensure the sentence is "sufficient, but not greater than necessary."  § 3553(a).  In Defendant's case, the "nature and circumstances of the offense" are serious, if not unique in the Southern District of

Iowa.  § 3553(a)(1).  Defendant pleaded guilty to selling a not insignificant amount of

methamphetamine in a conspiracy with his older brother.  ECF No. 85 ¶ 16.

    With respect to "characteristics of the defendant," § 3553(a)(1), this was not his first

offense.  Indeed, because of prior convictions, Defendant and his brother would have faced life

in prison had the Government taken its prosecution to its extreme.  *Compare* ECF No. 104 ¶ 6,

*with* ECF No. 85 ¶ 5.  Yet those previous offenses must be considered in the totality of

Defendant's life.  *Koon*, 518 U.S. at 113.  As discussed above, Defendant has "had a very

difficult" one.  ECF No. 133 at 16:11–12.  The Court realizes that much could be said about most

defendants in drug cases; contraband, after all, seems to promise a quick, if risky, path out of

working-class poverty.  *See Gall v. United States*, 552 U.S. 38, 54 n.9 (2007).

    But Defendant provides an extraordinary example: growing up in a poor home where

both his parents and older siblings openly used and sold methamphetamine—and continued to do

so following police raids of their home.  Defendant no doubt made a terrible choice to join the

family business; but it would be disingenuous to pretend that choice was just as difficult for

Defendant as it might be for a youth with two professional parents and an older brother away at

college.  As Defendant memorably put it at sentencing: boys look up to their fathers.

    Against this backdrop, it is all the more remarkable that Defendant appeared to break free

from this cycle of illegality just before the 2008 financial crisis and just after his father died from

a methamphetamine-induced heart attack.  *See* ECF No. 85 ¶¶ 81, 85.  It is more remarkable still

that he has developed such a close, enduring relationship with his wife and children—to say

nothing of maintaining that relationship from a federal prison.

    Defendant has letters of support not just from his nuclear family, but also more distant

relations—including his Godmother-in-law—and would-be employer.  ECF No. 132 at 12–37.

The Court has received many motions for compassionate release during this pandemic.  Sad as it is to say, such outpourings of support cannot be presumed.  Even in the face of economic uncertainty, the Court is confident Defendant is prepared to rejoin society and remain a lawful participant.

The "need for the sentence imposed" also appears weaker after eleven years of incarceration.  § 3553(a)(2).  Congress, by amending § 841(b)(1)(A), made clear that the "seriousness of the offense" does not automatically warrant twenty years in prison.  And given Defendant's prison record and reformed older brother—his last conduit to drug-selling, incarceration is unnecessary "to protect the public from further crimes of the defendant." § 3553(a)(2)(C).  Meanwhile, Defendant's use of prison programming and employment suggests an actual vocation—outside of prison—would best "provide the defendant with needed educational or vocational training."  § 3553(a)(2)(D).

Nor is incarceration the only "kind[] of sentence available."  § 3553(a)(3).  Noncustodial sentences also curtail "prized liberty interests" and "the Defendant always faces the harsh consequences that await if he violates the conditions" attached to such a sentence.  *United States v. Gall*, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005), *rev'd*, 446 F.3d 884 (8th Cir. 2006), *rev'd*, 552 U.S. 38 (2007).  Such restrictions also promote respect for the law, protect the public, and do not constitute any endorsement of Defendant's conduct.  *See id.*

Although it is true the Sentencing Commission's Guidelines counseled in favor of a longer sentence, they are but one factor.  *See*  § 3553(a)(4).  Finally, the Court must seek "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  § 3553(a)(6).  Such a disparity exists where Scottie has been

released and free from supervision, while Defendant remains in custody.  This is especially so since they both faced the same statutory minimums because of their prior felony convictions.

A court's decision does not cease to be an "exercise of reason simply because it is also an exercise of compassion." *United States v. Likens*, 464 F.3d 823, 827 (8th Cir. 2006) (Bright, J., dissenting), *cited with approval in Gall*, 552 U.S. at 52 n.7.  The Court grants Defendant's Motion for compassionate release because it is supported by extraordinary and compelling reasons as well as the § 3553(a) factors.

D.  *Release Plan*

Defendant's term of imprisonment is reduced to time served, and he is sentenced to a term of supervised release that runs until his current release date plus the ten-year term imposed at sentencing.  In addition, Defendant shall reside at the home of his aunt, Lorna Lepley, at 2415 Des Moines Street, Des Moines, Iowa, until he finds suitable housing.  The U.S. Probation and Pretrial Services Office (USPO) must approve any address change.  The Government suggests the Court include "home confinement" as a condition of supervised release under 18 U.S.C. §§ 3583(d), 3563(b)(19).  *See* ECF No. 136 at 10.  Given Defendant's need to find long-term housing and secure employment, the Court is hesitant to impose home confinement at this time.  If, however, the USPO thinks such a condition would be appropriate and compatible with Defendant's work, the Court would consider a motion to modify conditions.

Defendant shall contact the Southern District of Iowa's USPO within seventy-two hours of release.  He shall self-quarantine at home for fourteen days following his release and submit to USPO screening for COVID-19 to the extent it is available.  He shall comply with national, state, and local orders regarding COVID-19.

## III.  CONCLUSION

For the reasons stated herein, Defendant's pro se Motion for Compassionate Release (ECF No. 125) is GRANTED.

IT IS SO ORDERED.

Dated this 3rd day of June 2020.

_Robert W. Pratt_
ROBERT W. PRATT, Judge
U.S. DISTRICT COURT